Good morning. My name is Michael Pichetta. I'm with the Federal Public Defender's Office in Las Vegas, and I'm representing Mr. Sechrest, who's the appellant here. May it please the Court, I think this is a case that presents what I think is a fairly simple question of federal civil procedure that arises in a context that's quite eccentric and a little complicated in the details, but fundamentally, I think, easy. I think this case is controlled in the procedural default aspect by foresight versus humanity. In the dismissal of the effective dismissal of the allegedly procedurally defaulted claims, both the previous panel of this Court and the District Court considered matters outside the pleadings. And therefore, that dismissal has to be treated as essentially one that occurred as a result of summary judgment. The rule in London, and I think it's Luke's or maybe Lew v. Ray, that the filing of an amended petition that omits claims, bars any litigation of the reason why those claims may have been admitted, doesn't apply under foresight versus humanity. I didn't know if you have to get into that. I mean, you were essentially ordered to do that. I mean, your client was. Yes, Your Honor. And, but I think that's a, that's sort of the easiest way to view the waiver issue. There is no issue of waiver. All right. But then we still have to decide, you know, we still have a sort of rule of mandate, law of the case problem. Yes, Your Honor. But as I think we've explained in the briefing, that doesn't control either. I think the point that I would like to make is that the form of order that the previous panel used in ordering the amendment to remove these claims, the supposedly procedurally defaulted claims, is something that would be sensible in an exhaustion context. And if you look at the order of the previous panel. Well, it's wrong. I mean, let's just agree it's wrong, because there's, you don't ordinarily, there's no reason to, this petition thing doesn't apply procedurally. Yes, Your Honor. But I think the reason that I am belaboring this just perhaps a little longer than I should is that this form of order has been used in another case where we are confronting the same problem. And I think what this Court needs, the position that this Court needs to take in resolving this case is that a district court cannot take the position that instead of ruling on claims, claims of procedural default, in the other case that's currently pending, it's a rule of, it's a question of a violation of Rule 41. What other case are you talking about? There's a case that has just been appealed where the same judge involved in this case, the same district court, ruled that unexhausted claims were introduced in a post-exhaustion petition, but remained unexhausted, and that was a violation of Rule 41. But instead of saying, so I'm going to deny or dismiss those claims, it did essentially what happened in this case. It told us, actually me, that we had to either abandon those claims or suffer denial of the entire petition. Those are two different problems. I mean, in this instance, the district judge was told to do this. It was a mandate, and it seems to me that he did the right thing, and that you did the right thing, and it's our problem now. In other words, that we, on the other hand, have a law of the case problem, not a rule of mandate problem, and we could say either there was clear error or there's new law. But in terms of what happened in the district court, it's probably right. The other case you're describing doesn't have the rule of mandate. That's true, Your Honor. What I'm – the reason I keep focusing on this is that this is the kind of order that introduces confusion between exhaustion and procedural default and leaves – Can I interrupt here? Unless I'm mistaken, you're trying to win this on a ground that's going to help you win in another case. No. I would much prefer to stay with this case and let the other case take care of itself. I absolutely agree, Your Honor. Because this wasn't out in public before you go to America. I think that this is just a problem. To answer Judge Berzon's question directly, there is no law of the case problem. Because the basis on which – Well, that's great knowledge. So why don't you just go to America? Okay, go ahead. I mean, I want you to feel – Let me just sum up on that, Your Honor. The problem with the supposedly procedurally defaulted issues is an adequacy problem. And the question of the adequacy of any state procedural default was litigated in front of the district court, in front of this court, and it was – and again, it was raised on remand from this court. And it was ignored throughout. So since the previous panel decision did not address the inadequacy problem, it's outside the mandate, and therefore, there's no law of the case problem with respect to that. There are various other theories. Here's a hint. You're going to win on this point. Let's move on. Then let's move on, Your Honor. The issue that I think is clearly most compelling, at least to me, is the prosecutorial misconduct issue. Because this is a claim on which the district court agreed that there was error. And so the question is only, is that error prejudicial or not under the BRAC standard? Now, I think that – Are you looking at the prosecutorial misconduct independent of the instruction or both together? I think in context, you have to look at the prosecutorial misconduct along with the instruction. The instruction – Then is fertile ground to plow. Okay, I got it. Well, the instruction on itself may or may not be okay. But even if it's okay, it opens the door to a very damaging argument by the prosecutor that's wrong. That's true. Although I think whether or not the instruction had been given, the same argument would have been made. I think the point is – It's a deal of what you got. I think the point – yes, Your Honor. I think the point is that although that instruction is fine as an abstract description of state law, it just does not apply to this case. This is the sort of situation that this Court addressed in Gallego and that the Nevada Supreme Court addressed in Geary v. State, which I cited in a letter to the Court last week. And I apologize for not having that in the briefing. Which is essentially directly on point. Yes, Your Honor. I mean, the situation – and when we get to the District Court's discussion of prejudice, which is to some degree replicated in the Attorney General's briefing in this Court, essentially the basis on which the District Court said this is harmless is a description that essentially tracks the language of Caldwell Maynard v. Cartwright and Godfrey v. Georgia. Labeling an offense heinous or atrocious or vile or any of these pejorative descriptions isn't a basis for finding death eligibility. And I don't think it's a basis for – Well, here you have, as I recall, in voir dire and closing argument, the prosecutor told the jury that even if they came back with a sentence of life imprisonment without possibility of parole, it just didn't work that way, that this 22-year-old person who committed heinous crimes could be out and about. And all this was up to the parole authorities and whatever the judge said and whatever they said wouldn't really deter them. And that was just false, because he committed the crime while he was on probation, but the statute doesn't apply. But he made a big thing out of it. He told the jury that in effect that when he gets out, you know, and they also heard that he was a sociopath, I guess, and he was a polymorphous something or another, diversions, and that if he got out and committed other crimes, that it would be on their responsibility, on their heads. And that's the argument basically that he made, and pretty prejudicial, and the judge comes along and doesn't correct him, either on voir dire or closing argument, and he gives an instruction that supports what the prosecutor was saying. Exactly, Your Honor, and – How much more prejudice do you need? I don't think we need any more prejudice. I think that this is just like Gallego, it's just like Geary. And if you look at the facts, in either Gallego or Geary, where it was fan prejudicial, in Geary it was in combination with other errors, but in Geary it was two murders that were – We're just talking here about the sentencing, not about the guilt. Yes, Your Honor, but the prejudice in Geary is Mr. Geary was sentenced to life in prison without possibility of parole for a murder. He was ultimately released, and he committed another murder. So this is not someone who is 22 and has a variety of problems who commits one act, although certainly a very terrible offense. In Geary, he had two chances, and he ended up killing two people. Can I talk about this case instead of Geary for a second? Sure. One of the things the prosecutor does in closing argument is to emphasize the aggravating factors. Yes, Your Honor. We now know that three out of those four aggravating factors are gone. We knew fairly early on that the depravity of mind was gone. We should have known actually from Godfrey, but with the Ninth Circuit still holds in 89 in Deutscher. Yes, Your Honor. We now know from O'Connell and then just recently that it's retroactive that we know that from the Nevada Supreme Court that numbers one and two, the felony murders, are gone. So the only aggravating factor that is valid under current law is attempting to cover up the crime and facilitate escape and facilitate the avoid – to avoid detection. Yes, Your Honor. Although I claim that that is invalid, too, but that's for another day. Let me ask you this. Procedurally, have you preserved the arguments that those three aggravating factors should not have been considered? Yes. How have you done that? Well, the claims that were raised in the second amended petition included a claim that the aggravating factors were unconstitutionally vague. Now – and then subsequently in the briefing in the Nevada Supreme Court, that was elaborated somewhat. Now, the question is, if we go back, and this is something where it is a – and this – let me start again. I think this circles back around to one of the issues that was presented in the exhaustion issue in the district court initially and ultimately in this court was, is an attack on all of the aggravators exhausted when the – or view of the aggravating factors is part of the Nevada Supreme Court's mandatory review under Nevada revised statutes 177. Why does this matter at this juncture? Let me put it another way. I mean, if we thought that there was prejudice from the combination of the prosecutor's argument, the instruction and perhaps the – given the emphasis on his likely dangerousness through the psychiatric testimony with that regard to whether the psychiatric testimony was right or wrong, what did the district court say about why it wasn't prejudice? Just that the – it was a terrible, heinous case. And that's all. And that's it. Because, of course, the district court did not consider any of these other issues because of the previous ruling requiring their removal from the petition. I guess what I'm asking you, do we need to get to the validity of the aggravators? I don't think so. I think technically speaking what this court does when we have an erroneous procedural block, an erroneously applied procedural bar against constitutional claims is under Valerio and other cases. You take a quick look at whether there are constitutional issues. No, but you're getting at the aggravators. I'm asking what do we need to get at the prosecutorial error slash instruction slash prejudice question without getting anywhere near the aggravators? Yes. Well, if we think that there's prejudice without getting to them. Right. But I'd like to say that the district judge finds that the prosecutorial error – he clearly finds that there's prosecutorial error in the argument. Yes, sir. But he finds it harmless by, number one, how terrible the crime is. But as he discusses how terrible the crime is, he specifically says, and the four aggravators that the jury was required to weigh were very important and therefore – so we don't have to agree with the district court's either result or line of reasoning. But the district court's line of reasoning in finding it harmless relied not just on the nature of the crime but specifically on the four aggravators. Yes, Your Honor. But I think this may be a slightly circular argument. But the fact is that the arguments are – the aggravators are part of the, quote, heinousness, unquote, of the crime. Yes, although the district – the jury was required – they were instructed that you're supposed to weigh the aggravators against the mitigating factors. Absolutely, Your Honor. You talk to anybody about, okay, I've got four factors. All of them weigh against him against whatever mitigating factors you might find. The argument changes and the emotional impact upon most people changes when you say, well, listen, there's only one aggravating factor and that you're supposed to weigh against the mitigating factors. And the aggravating factor is that this murderer was committed in order to avoid detection. That changes – I mean, if you're a defense lawyer, you'd love to be able to say there's only one aggravator instead of four. Yes. And absolutely, Your Honor. And of course, if you look at the prosecutor's argument, the drumbeat in the prosecutor's argument, in addition to being the certainty of Mr. Seacrest being released, which I think by itself is prejudicial under any standard, but the drumbeat in the rest of the argument is depravity. This is a depraved killing and that is allowed because of the unconstitutional depravity aggravating factor. I tend – my position is twofold. One, the prosecutorial misconduct argument is sufficient to require reversal of the district court's judgment all by itself. To the extent that consideration of anything other than that argument is required, then we have to consider all of the arguments with respect to the aggravators, which I believe are invalid, including the avoiding arrest aggravator. And if you look at page 1772 of the excerpt of record, where there is a pleading with respect – there is a very cursory reference to the invalidity of the aggravators. It's followed up at 2640 of the excerpt of record. That's enough for this court to take the quick look, which is all that Valerio in previous cases requires when we're talking about whether a procedural error requires reversal of the resulting judgment. Now, I certainly agree with – well, I hope I agree with Judge Berzon that the reversal as is, and then the district court will have to vacate the death sentence, and whatever happens with respect to any other issues will happen with respect to those issues in the district court in the first instance. There's, of course, another – I mean, in a case like this, we're talking about the possibility of an inward error. Do you want to talk about letting Dr. Giroux get on the stand? The district judge found that that was a prejudice, but he stopped the first problem strictly, and that is to say it was sufficiently confident. Yes, which was contrary to the finding of the state district court, and therefore I think a violation of the presumption of correctness. The difficulty with allowing Dr. Giroux to testify is that I think – the difficulty is that the district court and the state courts had a problem relating on what exactly Mr. Giroux said. The argument is Mr. Amar thought that there were some good things about what Dr. Giroux would have said, but his tactical decision was I'm not going to call him. And it's obviously worse for him to be an adverse witness than to be your witness if he's going – if it's not – if he doesn't want to call him directly, why would he want to allow the opposition to put him on instead, which is bound to be worse. In a nutshell, yes. I mean, that is the difficulty with the way the district court traced through this. It's one thing to say, all right, I'm not completely happy with everything Dr. Giroux is going to say, but I'm going to put him on the stand, and I am going to limit my examination to these narrow topics. And I can prepare him, and I will have some notion of what he's actually going to say before I make the final decision. Yes, Your Honor, and then the prosecutor will be limited in cross-examination to what I've covered and will not be able to go all over the landscape eliciting things – eliciting Dr. Giroux's opinion about other subjects, such as the sociopath issue. So it seems to me, if we agree that Mr. Amar – the defense attorney can put the psychiatrist on and just get the good things done, then you have cross-examination. Well, Your Honor, under Nevada law, the opposing party is limited in cross-examination to the scope of the direct. Now, if, for instance – Well, for purposes of determining the prejudice on the other issue, it doesn't matter, does it, whether he was properly put on or not properly put on. What matters is that he said a great deal of stuff about the likely dangerousness of this person if he were out. For purposes of prejudice question as to the prosecutorial misconduct. Well, yes, Your Honor, except that I don't think we can get to that point with respect to considering Dr. Giroux's testimony as prejudicial if it's perfectly fine that counsel put him on. It still demonstrates – it still – because it was in there, it makes it much more likely that the jury was, in fact, influenced by the likelihood of him getting out and being dangerous because they were being told that if this guy gets out, there's no way anybody's going to be able to fix him and he's going to be a terrible problem. Yes, Your Honor. If they were told that, it would be less likely that they would actually have acted on it. When you have somebody testifying, this defendant is an incurable sociopath, I think, and that is the testimony that was elicited by the prosecutor. I think, in combination with the prosecutorial misconduct, that that clearly does up the ante in terms of the prejudice. And for that purpose, it doesn't matter whether he was properly there or improperly there. I believe that's true. Let me ask you this. How much information do we know that Sechrest's lawyer had? I read the report that Dr. Giroux prepared, which doesn't say incurable sociopath. As I read that report, if I'm Sechrest's lawyer, I don't particularly want to put him on. But what he says on the stand is much more damaging than is in that report. Yes, Your Honor, and that's the lack of preparation problem, is that whether or not there were a way for Mr. Amarch to have put Dr. Giroux on the stand and confined his testimony to what might have been helpful in exposing only the cross-examination on those issues. The incurable sociopath jumping out, that was not part of what Mr. Amarch knew. And I think it's somewhat telling that in the state post-conviction hearing on this issue, Mr. Lane, the prosecutor in this case, was called to testify that putting somebody on the stand without thoroughly prepping them was ineffective. And I think that's a large reason why the state district court found that Mr. Amarch was, in fact, ineffective. And that's a situation where it's essentially turning over all of the defense case to the prosecutor. He turned over the file, doesn't he? That he had on his client? He turned over the report, what Dr. Giroux found out from Mr. Seacrest about his background. That basically came out in the testimony. Because that was something that was not independently investigated by counsel at trial. If I may, could I reserve the remainder of my time for a moment? Didn't he get the psychiatrist? Well, first of all, the psychiatrist had the report. The psychiatrist prepared the report and he also had conversations. Where did he get the additional information? From Mr. Seacrest. From Mr. Seacrest? Yes. It was part of his interview with Dr. Giroux. Did he get any from the lawyer? I think he got only a couple of old juvenile adjudications, but I think that was really all. Because if you look at the file in this case, and this came out in the state proceedings, it's about this big. This is the problem with the lack of adequate preparation, both in terms of investigating the mitigation and investigating and discussing with Dr. Giroux what was actually going to come out if he testified, that essentially this wild card was turned over to the prosecutor without Mr. Harnemeyer knowing everything that was going to come out. Thank you. If it pleases the Court, my name is David Neidert. I'm the Senior Deputy Attorney General with the State of Nevada. I heard the Court's hint with respect to procedural default, but respectfully, I believe that Judge Reed actually got it right when the case came back. He probably did get it right in terms of what he had to do. I think that's probably true. But that doesn't answer the question, does it? Well, he then gave the opportunity. He said, we're going to restart the litigation and let's litigate the issue of procedural default. No, but then he said, then you came in and said, oh no, that's not what the Ninth Circuit ordered, and you were right about that. And then he changed his mind and said, no, that's not what the Ninth Circuit ordered, take this stuff out, and he was right then. Well, you see, I came in and said, the Ninth Circuit came in and talked about procedural default. And said, take these things out and go forward, if you want to go forward. And then Judge Reed said, no, Mr. Deputy Attorney General, you're wrong. But then later he said you're right. I don't think he ever said I was right. What he said is, we're going to restart. We need to litigate the issue. Well, he was very blunt in telling me I was wrong. Well, he then went ahead in the end and ordered them to do what the Ninth Circuit said they should do. He told you you were wrong, but then in the later order, when he says, OK, take them out, he basically acquiesces to your reading of the Ninth Circuit's order, which I think was the right reading of a mistaken order. And he also says, I have to say in that second order, well, and the defendant has basically said they will do so. Although the defendant, having said, or the habeas petitioner said he will take them out, was done, of course, under duress, under threat of, well, if you don't take them out, you can't have anything. It sounds to me as though there may even be a judicial estoppel argument here, as to say your position now is different from the position that you took in front of Judge Reed. Like I said, I think Judge Reed was actually right. And I think looking at the perspective of what happened... He was right when? He was right when he said that when this court said the, talked about procedural default in its prior order, that... That we were in error. That this court was in error, because the issue was... You were right when you said he had to do it anyway. And, but then he said I was wrong. And he said everybody, we're going to now litigate procedural default. And he then changed his mind. And I respect that, but I don't read his order subsequent to that, that he changed his mind. I read his order as saying, okay, let's restart litigation. So I did what the judge told me to do. I said, these issues are procedurally default. I put procedural default in play, which is requirement. Then, opposing counsel wrote the pleading that he did, that apparently, the way I read his pleading, is that he was conceding that he was sort of engaging in a piecemeal type of litigation, and that he was now prepared to file an amended petition. Because the petition says, on top of it, because the Ninth Circuit ordered me to do this. And he was right. Isn't that the first sentence in the new pleading? I have it up on the table. I trust you when you say that's what his pleading says. I'm not going to disagree, but I don't have it immediately in front of me. And then, procedurally, we were at the juncture where Judge Reed was telling him what to do, and he chose not to litigate procedural default, which is what Judge Reed said he wanted to do. And he said, I want to file an amended petition, although I agreed to entitle it opposition in response, or something like that. And then he filed the amended petition containing just the unexhausted claims. But the tenor of the order that I was looking at the record back, and I took over the litigation of the case immediately after the Ninth Circuit's prior order, was that Judge Reed wanted to litigate procedural default. And in fact, Mr. Lindsey had argued procedural default in this Court. And our position in this Court was, no, procedural default's not in front of the Court. In the prior briefs, pages 45 to 69 of Mr. Lindsey's brief in the prior case, talk about procedural default, which we dealt with in one or two paragraphs. The new petition, the third petition, begins, introduction. In accordance with the decision of the United States Court of Appeal for the Ninth Circuit, this third amended petition for a writ of habeas corpus has been amended to eliminate all claims which have been adjudicated as procedurally barred. It was your position in the District Court that that was correct. So he did, you said this, he did it, and now you're turning around saying that he shouldn't have done it. Well, I'm saying that where we were at at that point, I'm saying that I was wrong in my argument then, and that Judge Reed was trying to get the litigation back on track, and that Mr. Lindsey chose not to engage the procedural default issue. And if you read his, if you read his pleading prior to that, Mr. Lindsey's Well, let's go to the next question. Do you agree that we were wrong the first time? I agree. Both because you don't have to eliminate procedurally barred claims, and because of new law afterwards that says that Nevada, in fact, doesn't follow its procedural bar sufficiently for it to be barred. Well, I would say that this Court was wrong in the first instance because procedural default was not before the Court in 1996. Well, that's the third reason. That was the third reason. I would respect, with respect to the adequacy of NRS 34810 as a default, I understand this Court sitting in Bonk decided that it was not consistently applied. That, even after that case came out, that issue, even then, Mr. Lindsey didn't do anything. He didn't file anything with the Court saying, hey, wait a second, the Ninth Circuit sitting in Bonk now has done this. That case came out well more than a year past after that, before Judge Reed issued his ruling, and during that entire period, there was nothing filed by Mr. Seacrest's counsel, even bringing that decision to the Court's attention or saying, well, maybe procedural default needs to be discussed again or anything else. He just let it sit there and he did not even mention it until his motion for reconsideration after the Court ruled. And then he did it in a sort of a one or two sentence very cursory way that I quoted in my brief. So, he didn't raise, he never really raised the fact that Valerio came out until after he waited to see how the Court would rule on these five claims before even saying, hey, wait a second, there's Valerio out there. So, I don't think he should be rewarded for engaging in that kind of piecemeal litigation. So, as far as Valerio being an intervening decision, I would respectfully disagree in that regard because of the way the litigation was being handled. Is it plain that the District Court could have done anything about that? Or was the District Court still bound by our mandate? I think the District Court I think the District Court's posture was very simple. It was like, here comes the mandate came down, he read the mandate, he realized procedural default was not an issue that really was before the Court because he'd only talked about exhaustion and finding claims were unexhausted. He came back, I made the argument, the Court's decision said procedural default, that's what we need to talk about, and the Court said, no, we claim to be procedurally defaulted. Murray v. Carrier says you have an opportunity to show cause and prejudice or a fundamental miscarriage of justice to overcome the procedural default, and that never occurs. A procedural default was never properly at issue. So I'm going to allow it to be put properly at issue. So we start the litigation, Mr. Deputy Attorney General identified the procedurally defaulted claims, and then you, Mr. Seacrest's attorney, will have an opportunity to show  I did my part. Mr. Seacrest's attorney did not do his part, and so the judge said, fine, and he said, I'm ready to file an amended petition having just the exhausted claims, and it moved forward from that juncture. So at that point, I think Judge Reed's mind, these claims had all been abandoned by filing the third amended petition. And so procedural default was not at issue with any of these claims, and so the application of Valerio was inapplicable because the five issues that were before the court, none of them were procedurally defaulted. So I think that's procedurally what happened in this case.  so while the court has given a hint the way it's leaning, I respectfully disagree with respect to what happened. I think Judge Reed was the one entity in all this that was getting everything right, was trying to get the litigation moving in the proper direction. He pointed out the direction he wanted to go, and Mr. Seacrest decided not to follow that direction. And it would have taken very little effort to have put procedural default at play, as Judge Reed said he wanted to do. In fact, he had spent pages 45 through 69 of his brief before this court talking about procedural default and the adequacy of Nevada's procedural default rules. He could have cut and pasted those and presented them to Judge Reed for Judge Reed to rule upon. He didn't do that. Instead he said, okay, I'll just do my presented exhaustive merits claims and move forward. So I don't want to belabor the point, but I do think that procedurally Judge Reed got it right. Mr. Seacrest's attorney may have had some misunderstandings, but there was no cost to him to follow what the judge would want to do. I think you've done as good a job as can be done with that point. Let me ask you this. Do you agree with District Judge Reed that the prosecutor's argument was error and that the question on that point is whether it's harmless? I think the I'm not going to stand up here and insult anybody's intelligence and I understand that, but I'm asking is it error in the legal sense? Not just is it wrong, but is it error? That's what the District Judge concluded, and I'm asking you, do you agree with him on that point? I'm not yet to the prejudice point. I argue that it wasn't quite error, but it certainly was not. It was right at the absolute line. So even if I'm saying I won't concede that it was error, but I'm saying it was close enough. It was tightrope in the line on whether and frankly it was not a necessary argument for the prosecutor to be making in this type of case. It was factually incorrect. It was absolutely a factually incorrect statement that Mr. Sechrest could be paroled tomorrow or whatever. Would be. He literally said would be. What he says is the board has the power to parole him tomorrow. He says now that won't happen, but I will tell you he's not going to serve a life sentence. So he says, he openly says he's not going to get out tomorrow. He says the board has the power to get him out tomorrow. That's wrong. That statement was factually, and I would agree that statement was wrong as a matter of law because in Nevada law, even if you're sentenced to life with the possibility of parole, you have to serve that minimum parole term before you can be paroled. But also he's factually wrong when he says he will get out. I mean. And that's also true. I think the Nevada does not have a mandatory parole provision for people that are serving life sentences. So it was certainly at the very best, the best possible reading, very ill-advised argument on behalf of the prosecutor. Assuming it's error and moving on with the question of prejudice, why in your view is not that error standing alone without yet getting into allowing Dr. Garot's testimony to come in without yet getting into the claims that we might send back under I'll call it Valerio, but the truth is Petrocelli and maybe McKenna that precede Valerio. But without getting into that, just looking at the prosecutorial argument, why is that harmless? I would argue that there are certain kinds of cases that while there's never a situation where death is an automatic sentence, there are certain types of cases where basically if the prosecutor  ladies and gentlemen of the jury, you heard the evidence in finding the defendant guilty, those errors, those facts mirror the aggravating circumstances we're alleging. We asked you to give the sentence to the defendant to death and sat down. That would have been sufficient. The prosecutor obviously didn't think so, and he made both a huge projection about this in a very emotional way, and he put on the psychiatrist to, in a very emotional and lengthy fashion, express the opinion that this person was irreparable and not salvageable and would do terrible things if he got out. So the prosecutor's judgment about this case was obviously that he did have to make a major production about both the fact that the guy would get out and that the fact that he would be very dangerous if he did. So you're basically disagreeing with that judgment? It would be on the head of the jury. I would... Remember that part? I remember that part. If you don't sentence him to death, he's going to get out, it's going to happen, and he's going to call an amorphous diversion, I think you would use language like that, and it's going to be on your head. People don't change. And I think my response would be that prosecutors have this very sad habit, for those of us doing appellate law, of over-proving their cases. They figure, yes, I have it right here, but why don't I try expanding the boundaries and make sure that I put everything on, just even though I'm 99% or 98% sure the jury is going to come back and give a sentence of death based on the horrible nature of this crime. And the judge let him get away with it. And I'm not defending the actions of the trial judge either, although Mr. Amar did not object. Who's about that instruction on the battle law? As far as being eligible for parole. Well, I don't know which attorney submitted the instruction or whether it was part of the judge's standard packet for death-type cases, but I'm assuming you're referring to this about the power of the Board of Pardons to commute a sentence. It says power of the Board of Pardons, but it doesn't say commute. And the jury is absolutely in the dark as to the difference between commute and parole. And any lay person, when thinking somebody is going to get out, they always say they're going to get out on parole. And I would agree, and in Nevada the fact that the Parole Board and the Board of Pardons are two actually separate and distinct entities. The Board of Pardons are the Nevada Supreme Court, the Governor, and the Attorney General. And the Parole Board is an appointed executive department. And the jury has told none of this. The jury simply said the Board of Pardons could let him out. And then the prosecutor runs with it and says, could, will. And any reasonable juror who's not legally educated at a fairly sophisticated level about Nevada criminal law thinks it's parole. And I get it. I think...  prosecutors throwing the power of the state and the power of his office behind what he's saying. I'm not defending anything the prosecutor said in this case. I've not done that at all. I think that I come back to, I think that the facts, the egregious facts of the case are to lie whether under a correct analysis they're egregious. This prosecutor had a habit of going overboard at times. Well, this particular prosecutor is no longer practicing law. But be that as it may. This particular prosecutor actually became a district judge and suffered a stroke several years ago and is no longer practicing law at all. The Nevada Supreme Court in Geary had a case in which somebody murdered somebody, was let out on parole, murdered somebody else, came back and it was otherwise quite identical to this in the sense that there was a very similar instruction, a very similar argument and for the same reason found that it was improper. And they found prejudice despite the fact that this guy was a two-time murderer. So given that how can we not find prejudice here? I think according to the facts of the case I think it has to do frankly with the age of the victims. The victims in this case were nine and ten as opposed to adults. And I think that at the time was not an aggravator under Nevada law. It is now. But I think that's a I'll call it a concern. Jurors I think the murder of children particularly with this kind of murder are particularly repulsive crimes. We're applying a Brecht standard. Is that right? Yes. It is a substantial and injurious effect on the verdict. I'm sorry? Yes, Your Honor. I was agreeing that Brecht requires a substantial and injurious effect on the jury's verdict. More probable than not or anything like that. How can we say that isn't the case here? And I'm putting in without regard to whether it was proper or not proper, the psychiatric testimony. I think as I said, the distinguishing fact between this and Geary is the fact that the murder of children is that once the jury found that he had murdered these two little girls He had a double murder. I mean, it was that guy who came back and murdered again. But I think that you talk about your average juror that's not sophisticated in the law. If you ask the average person on the street, which murder is more atrocious? I'm not saying that all murders are atrocious, but which is worse? He was put in jail, sentenced to death, muted, comes out, and murders somebody again. Well, he actually came out and murdered again, sentenced to death. But I understand what you're saying. Yes, this is a person who likes to kill people. But again, I think it goes back to the jury. You asked the average person on the street. Killing a child is a more repulsive act in their mind. It's a much huger act, particularly when there's a sexual component, as there was in this case, than killing an adult. All human life is precious, but I think there is the general public that the lives of children are more precious than the lives of adults. And that would be my response, Your Honor. That was a fair amount of the district judge's response. He talks about aggravators, but he describes in a few sentences the nature of the crime. And it was a truly horrible crime. And I think you can't discount the facts of the horrible nature of this crime in saying whether anything would have caused that jury, once they found the aggravators were present, to not return a death sentence. Well, maybe the prosecutor's argument you could argue that's an indicator that the government thought it had a, you know, not so strong a case as far as the death penalty. You know, pull out all stops. And I would respectfully disagree at more overproving the case. You have this... I think your observation is a sage one, and I often wonder about the same thing. Why do they do this? But this one was extreme in the degree to which it dominated the penalty phase of the trial. And I would say the facts of the murder were also extreme, which is why I say that if it was error, it was harmless error. As we're evaluating the harmless error question, what do we do with the fact that we had four aggravators that the prosecutor was allowed to rely on at that point, and we now have three of those four aggravators. I guess I want to ask you, but my instinct is that the law is now quite clear that three out of those four are not permissible aggravators. The first two are felony murder, and they're gone under McConnell, and we've just been told in November this last year that that's retroactive, so they're not permissible. And the depravity of mind part of that aggravator we know from Deutscher, we probably knew from Godfrey, but we know for sure from Deutscher in 89 that that's gone. I guess you could argue that it was mutilation, but that was a pretty half-hearted argument, and I don't think it's even mutilation under Nevada law. He really was arguing depravity. This is a long way to ask, it's almost a procedural question. As we evaluate the harmlessness of the argument, do we evaluate the harmlessness of the argument as if the jury had only one aggravator in front of it, or do we evaluate it with them looking at the four aggravators that we now know, three out of four are wrong? I would suggest that given the horrific facts of this case, that it doesn't really matter. It's my position that... But if I think it matters, do you have an answer? I think... I guess my response would be that even if you did just the one, I think certainly the State might say look at the four, even if those three are now invalid, the jury certainly, but even if you have just the one valid aggravator remaining... Yeah, but that's your answer that it doesn't matter. What I'm really asking you is as we're doing our legal analysis as to whether or not it was harmless or not, do we consider it as if only one aggravator was properly in front of the jury and being considered by the jury, or do we say assume all four aggravators are there and the only difference is this prosecutorial misconduct in the argument? And I guess my response would be this Court could do it either way because the results would be the same. There's an embedded procedure. You really don't want to answer my question. I'm trying to think of a way to articulate. I'm not trying to dodge it, but I'm trying to think of a way to articulate it without repeating myself because I think I'm looking more at the prejudice and you're looking at another part of the analysis. But, sir, isn't there an embedded procedural question which is that the validity of the aggravators is in the chunk of issues that we would send back if we thought that there was an error on the procedural default. Is that right? Sure. And the question is can we, as I understand what Judge Fletcher's asking, even though those have not been ruled upon yet by the District Court and would be in that chunk, can we go at them directly as part of the prejudice issue in this case? I think so. Yes. I think you could. I think you could look at just the one that you would say, assuming that these three are now invalid. One certainly isn't. Two probably are. You could look at just the one and do the analysis. When you say two probably are, you think the felony murders are only probably invalid? Well, three are. Three are. I'm not sure. My understanding of a correct analysis is that we're supposed to put ourselves back in the shoes of the jury that was there. And wouldn't that include and it might include maybe whatever mistakes there may have been with regard to aggravating factors in the sense that what we're really trying to find out is whether this thing we're looking at actually influenced the jury, not whether it might have if they were properly instructed because they weren't. I'm not sure you're right, but it's an That's a hard one for me procedurally. I'll say it that way. I mean, the courts have said aggravators can be re-weighed in hindsight if one's thrown out, etc. So it's hard to I'm down to three minutes and I have yet to discuss Dr. Jarreau. I'm sorry. I said I'm down to three minutes and I have yet to discuss Dr. Jarreau and I'm sure, based on your question, you have some questions with respect to that as well. Well, the Dr. Jarreau question is really, I mean, let's assume that this Fifth Amendment issue was wrong or not there. So we're really talking simply about whether an ineffective assistance issue with regard to whether there was any rationale for the tactical rationale for the lawyer to have waived medical and attorney-client privilege and allowed this guy to go on. On what rationale would a person putting the guy on himself, if you thought it was helpful, let the prosecutor put him on? I think you can at least one rationale that I can think of would be that the prosecution gets to go first and by putting the defense expert, Dr. Jarreau in this case, on the stand and allowing him to testify, it could potentially create an argument saying, look, they put our psychiatrist on the stand and the psychiatrist was helpful. But looking at 20-20 hindsight, the record seems to indicate that Mr. Amar talked to Dr. Jarreau and kind of talked to him on several occasions and I didn't talk to him after he agreed to testify for the prosecution. I'm not sure whether it's clear whether he did or not, but then he agreed to let him talk to the prosecution. Judge Reeds actually expressed it fairly well. He wrote on page 55 of his opinion, it's easy to second-guess Amar's decision. However, it is not for this court to judge the wisdom of Amar's tactical decision in retrospect. Rather, this court must determine whether Amar actually made such a tactical decision and whether he made it on reasonably sufficient information. And then he goes on for several pages of his opinion explaining why, in his estimation, that standard actually was met. Why he disagreed with the state district court on the deficient performance prong of Strickland. I think he is. It's kind of interesting. This is a pre-ed case and the Strickland prong, both of those are issues of law. And it's sort of interesting, sort of reversal of normal positions in these cases. Typically, I know that the Attorney General saying, look, you have to give deference to the legal conclusions of the state court. This is a pre-ed case, and I don't think that in this pre-ed setting, Judge Reed was obliged to give any deference to any legal conclusions. He was looking at the case in a normal situation. It's sort of different in that respect, but I don't think he was required to give any deference at all to the legal conclusions of any Nevada court because it's a pre-ed case. Unless there's any other questions, I would respectfully ask the Court to affirm Judge Reed's opinion in all respects. I'm afraid I am one of those lawyers who commits the cardinal sin of continuing to argue after the court has made its position clear. I think I've done enough of that this morning. Unless there are any other questions, I'm prepared to submit it. Thank you.
judges: Pregerson, W. Fletcher, Berzon